# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
April 18, 2012 Session

## IN RE EMILY N. I., ET. AL.

### Appeal from the Juvenile Court for Jefferson County
### Nos. 9598, 8758, 8759    Hon. Jayne Johnston Crowley, Judge

### No. E2011-01439-COA-R3-PT-FILED-MAY 30, 2012

This is a termination of parental rights case in which the Tennessee Department of Children's Services filed a petition to terminate the parental rights of Teresa O. and Harrison O.[1] Teresa O. was the mother of three children, while Harrison O. was the father of two of those children. The trial court terminated Teresa O.'s parental rights to all three children and terminated Harrison O.'s parental rights to his two children. Teresa O. and Harrison O. appeal. We affirm the decision of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

J. Michael Kerr, Jefferson City, Tennessee, for the appellant, Teresa O.

Rebecca C. Vernetti, Sevierville, Tennessee, for the appellant, Harrison O.

Robert E. Cooper, Jr., Attorney General and Reporter, and Marcie E. Greene, Assistant Attorney General, General Civil Division, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Charles Scott Justice, Jefferson City, Tennessee, guardian ad litem for the minors, Emily N. I., Preston R. P. O., and Jeffery J. R. O.

---

[1]This court has a policy of protecting the identity of children in termination of parental rights cases by initializing the last names of the parties and the children.

## OPINION

## I. BACKGROUND

Emily N. I. ("Emily") was born to Teresa O. ("Mother") and Gary P. on June 19, 2001.[2] Preston R. P. O. ("Preston") was born to Mother and Harrison O. ("Father") on August 19, 2006. Emily and Preston were removed from the home in 2008, following allegations that Mother had abused them. Emily and Preston were returned to Father with strict instructions that Mother was only to visit Emily and Preston when supervised by someone other than Father. Emily was removed from Father when Emily was seen alone with Mother and Father (collectively "the Parents").

Following Mother's completion of parenting classes and anger management, Emily was returned to the Parents for a trial home placement. Four months later, Mother alleged that Father had abused her. She, Emily, and Preston moved in with the maternal grandparents. In October 2008, Emily was removed again and placed in the custody of the Tennessee Department of Children's Services ("TDCS") after having been found naked with another child.[3] TDCS learned that Mother told Emily to lie about the incident and that Emily had observed Father watching movies with "naked people." Preston was returned to Father, while Emily was adjudicated dependent and neglected. At some point, the Parents reconciled. Jeffery J. R. O. ("Jeffery") was born to the Parents on April 16, 2009.[4]

In May 2009, the Parents, Preston, and Jeffery were involved in a single vehicle accident while riding in Father's truck. Mother and Jeffery were ejected from the truck and were seriously injured.[5] Preston and Jeffery were not properly restrained in their car seats at the time of the accident. Officers found a beer can, women's underwear, and a substantial amount of pornography in the truck. Preston and Jeffery were removed and subsequently adjudicated dependent and neglected.

The Parents were charged with reckless endangerment and entered best interest guilty pleas to misdemeanor reckless endangerment. In August 2009, Father was charged with driving under the influence ("DUI") and eventually entered a guilty plea to that charge.

---

[2]Gary P. voluntarily surrendered his parental rights to Emily and is not a party to this appeal.

[3]Emily was never returned to the Parents after the October 2008 removal.

[4]The Parents subsequently had a third child together but that child was not included in this termination case.

[5]Jeffery suffered from a brain trauma, resulting in brain damage. As a result of the accident, Jeffery is developmentally delayed and it is questionable whether he will ever live a normal life.

Several permanency plans were issued for Emily, Preston, and Jeffery (collectively "the Children"). TDCS developed three plans for Emily, which were dated November 4, 2008, May 15, 2009, and December 11, 2009. Each plan was ratified by the trial court. The Parents signed the first plan and attached notice of the criteria and procedures of termination, while only Mother signed the other plans.

Emily's November 2008 plan contained two desired outcomes that required the Parents to complete specific action steps. The first desired outcome provided, "Emily will have a loving, stable home free from abuse." To complete that outcome, the Parents were required to

> complete parenting, anger management, and domestic violence classes; and demonstrate parenting techniques.

The second desired outcome provided, "Parents will follow guidelines of having a child in state custody." To complete that outcome, the Parents were required to

> comply with court orders; provide a legal source of income; cooperate with TDCS; maintain contact and notify TDCS of changes with Emily; notify TDCS of changes in contact information; provide verification of completion of actions steps; sign releases of information; and pay child support according to court orders.

Emily's May 2009 plan contained three desired outcomes. The first desired outcome provided, "Emily will have a loving, stable home free from abuse." To complete that outcome, the Parents were required to

> complete parenting, anger management, and domestic violence classes; demonstrate parenting techniques; complete a parenting assessment; use a different provider for each required course; use a different provider for each repeated course; complete a mental health assessment and follow recommendations.

The second desired outcome provided, "Emily will be in a home without pornographic exposure." To complete that outcome, the Parents were required to

> allow TDCS to search the home for pornographic material; remove any pornographic material from the home when Emily is present; and prohibit Emily from accessing the television when left alone in the room.

The third desired outcome provided, "Parents will follow guidelines of having a child in state custody." To complete that outcome, the Parents were required to complete the same steps for that outcome found in the November 2008 plan.

Emily's December 2009 plan contained the same three desired outcomes as in the May 2009 plan. The action steps required to complete the first outcome were somewhat different. Father was tasked with completing domestic violence classes, while Mother was tasked with demonstrating appropriate parenting techniques and completing a mental health assessment. The Parents were tasked with completing a bonding assessment, not repeating any courses with the same provider, and providing documentation of their completion of the requirements to TDCS. The action steps required to complete the second and third outcome were the same except the Parents were not tasked with allowing TDCS to search the home.

Relative to Preston and Jeffery, TDCS developed two plans, which were dated July 24, 2009 and December 11, 2009. Each plan was ratified by the trial court. Father refused to sign the July 2009 plans and attached notice, while Mother signed the plan and attached notice even though she evidenced her disagreement with the plan. The July 2009 plans were substantially the same for Preston and Jeffery and contained the same three desired outcomes. The first desired outcome provided, "[The Parents] will provide a loving and safe home for [Preston and Jeffery] that is free from all types of maltreatment, abuse, and violence." To complete that outcome, the Parents were required to

> complete age-appropriate parenting classes, addressing safety restraint laws, discipline and nutrition; demonstrate parenting skills during visitation; not allow the children access to pornographic material; and complete a mental health assessment and provide documentation of completion.

Father was also specifically tasked with providing documentation that he had completed domestic violence education. The second desired outcome provided, "[The Parents] will follow the guidelines of having a child in state's custody." To complete that outcome, the Parents were required to complete the same action steps contained in Emily's plan for that outcome, except the Parents were instructed to "pay child support per state guidelines and/or court orders." The third desired outcome provided, "[The Parents] will ensure that [Preston and Jeffery's] medical needs are appropriately met." To complete that outcome, the Parents were required to

> follow recommendations from medical professionals; ensure Preston and Jeffery attend medical and therapy appointments in order to educate themselves on their condition and needs; attend medical appointments with Preston and Jeffery; complete medically fragile training for Jeffery; attend

mental health appointments with Preston and educate themselves on his mental health needs.

The December 2009 plans contained the same desired outcomes and the same actions steps, except the requirement that the Parents complete medically fragile training was not mentioned. The Parents signed both plans and attached notice. The Parents evidenced their disagreement with the plans.

Mother was never tasked with remitting child support because she was disabled. On March 3, 2010, the trial court entered an order, directing Father to pay child support for Preston and Jeffery at the rate of $239.50 per month per child and $10.50 per month per child toward his child support arrearage. Father remitted $200 in child support on April 27, 2010, $100 in child support on June 16, 2010, and $100 in child support on August 18, 2010. TDCS intercepted Father's 2010 tax return in the amount of $5,383, which was to be applied toward his arrearage of $4,590 in child support for Preston and $4,590 for Jeffery.

On April 30, 2010, TDCS filed a petition to terminate Mother's parental rights to the Children and Father's parental rights to Preston and Jeffery. The grounds asserted for termination were abandonment for Father's failure to pay child support, abandonment for the Parents' failure to provide a suitable home, the Parents' substantial noncompliance with the permanency plans, persistence of conditions, and severe child abuse.[6]

A hearing on the petition was held. Deanna Gray, child protective services case manager for TDCS, stated that she was first acquainted with the family in January 2008. Ms. Gray spoke with Emily, who had "bruises on her arms, her side, and up and down the front and backs of her legs." Emily explained that Mother was upset with her and started "whooping her" because she could not complete her homework. Emily claimed that in general, Father[7] spanked her more than Mother. Ms. Gray opined that Mother's explanation for the injuries was inconsistent with the placement of the injuries. She recalled that when Emily and Preston were removed, Mother was only concerned about the taking of Preston and stated, "Don't take my boy." She related that domestic violence was also a concern because Mother reported that Father was physically and verbally abusive.

---

[6]The finding of severe child abuse was on appeal at the time the petition was filed. The ground for termination was later removed because the Parents agreed to stipulate that the Children were dependent and neglected in exchange for the withdrawal of the allegation of severe child abuse.

[7]Emily referred to Father as her biological father even though Gary P. was her biological father.

Ms. Gray testified that she spoke with Emily about the incident in which Emily was found naked with another child. Emily initially denied the interaction but later disclosed that she allowed her cousin to get on top of her after she had removed her clothes. Emily claimed that her grandfather caught her on one occasion, that Mother caught her on another occasion, and that they were not caught the third time. Emily also disclosed that Mother rubbed her nose in her urine when she peed in the bed. Emily explained that in order to avoid having Mother rub her nose in urine, she often hid her urine-soaked bed linens in the closet.

Ms. Gray testified that she was also involved in the subsequent removal of Preston and Jeffery following the car accident in 2009. She recalled that a beer can, pornographic magazines, and women's underwear of various sizes[8] was found in the truck after the accident. She related that Father was driving a single-cab pickup truck, with a bench seat that accommodated three people.[9] She later learned that the Parents had been engaged in an argument and that Father was speeding when the accident occurred.

Cindy Wilhoit testified that she worked with the family through TDCS's family support services in 2008. She recalled that she procured intensive in-home services for the Parents in an effort to reunite the Parents with Emily and Preston. She worked with the family from March until October 2008. She said that Emily was residing with another family when she was first assigned to the case and that Emily appeared "happy," had bonded with the family, and was no longer wetting the bed. She opined that when Emily was returned to the Parents, Emily "was not as verbal" with her, "appeared to be somewhat guarded," and was reported to have wet the bed on at least two occasions. She related that in September 2008, she received a call from Father in which he stated that Mother had taken Emily and Preston. She stated that Emily and Preston were located but that she received another call the next day in which Father told her to retrieve Emily and Preston. Father alleged that Mother had hit him and that Emily saw the interaction. Mother alleged that she found "sex numbers" on Father's phone and a letter addressed to Father, reflecting that he had been enrolled in a sexually explicit program. Ms. Wilhoit stated that the Parents were advised to seek domestic violence counseling. An exhibit was entered reflecting that Mother had attended domestic violence classes in 2008.

Mother testified that she worked to complete all of the requirements contained in the permanency plans. She related that she was required to complete a series of classes more than once because of her continued involvement with TDCS. Relative to the 2009 plans, she

---

[8]Mother admitted ownership of the underwear, alleging that she placed them in the car in case she experienced heavy bleeding.

[9]Initially, Father claimed that Mother was driving at the time of the accident.

said that she submitted the required documentation reflecting her completion of the requirements. She admitted that despite specific instructions from TDCS, she used the same provider for parenting classes that she used in 2008. She said that she completed a mental health assessment in 2009 but admitted that she was required to obtain another mental health assessment because she and Father lied to the assessor. She completed the assessment two months after the termination petition was filed. She also completed the bonding assessment and 15 hours of psycho-educational sessions.

Relative to Jeffery, Mother said that Jeffery was doing better but that he needed "someone to bathe him, feed him, love him, [and] give him extra special care" because he was "different from a normal child." She did not know the name of Jeffery's treating physician and could not explain why Jeffery was "different" other than to say that he was hurt in the accident and that he suffered from brain damage and had fluid on his brain. She stated that she attended most of Jeffery's medical appointments until Father lost his job. She said they attended a few appointments after Father was fired even though she no longer received a list of the appointments. She opined that she went to every appointment that she was able to attend and that she asked Jeffery's therapist questions but that the therapist "acted like she really didn't want to tell us anything." She insisted that she was denied access to Preston and Jeffery's medical records. She recalled that Emily was attending therapy sessions but admitted that she had never contacted the therapist to ask about Emily and that she did not know the name of Emily's primary care physician.

Mother insisted that she and Father did not have a history of domestic violence and claimed that her mother reported Father simply because she did not like him. She denied that Father had ever been charged with domestic assault but recalled that Father had been arrested on at least one occasion after her mother called the police. She stated that there really was not a reason for her to attend domestic violence classes. She could not recall the incident between her and Father in which Father alleged that she hit him while he was holding Preston. She denied that Father had ever hit her. She denied that Father possessed pornography or that he obtained a membership to a sexually explicit program. She explained that while Father received mail about the program, he did not order the membership.

Mother admitted that she had been charged with simple possession of marijuana in 2005 but could not remember whether she had pled guilty to that charge. She also admitted that she had entered a best interest guilty plea to reckless endangerment for the car accident.

Mother testified that she was tasked with handling the family's finances and that she and Father did not have enough money to send child support. She explained that they had to find a place to rent and that Father had lost his job. She related that their only source of income was her disability income, their tax refund, and Father's unemployment check. She

recalled that they drove long distances to attend Jeffery's medical appointments and to visit with the Children and that they spent money on gifts and food for the Children. She asserted that they did not send child support until they received the court order because they "were buying things every time" they visited the Children. Relative to Preston's behavior during visitation, she stated that it was difficult to discipline him when she was only allowed to visit him for short periods of time.

When asked why Emily had been removed, Mother stated, "I disciplined her too hard." When asked whether she was at fault for the Children's continued placement in TDCS custody, Mother stated, "No." Mother claimed that she did not understand that her parental rights could be terminated if she failed to fulfill the requirements contained in the permanency plans. She acknowledged that she signed the criteria for termination of parental rights but asserted that she did not read the information and that the information was not explained to her. She admitted that the trial court instructed her that failure to fulfill the requirements could result in the termination of her parental rights.

Mother testified that her home[10] was adequate for the Children. She stated that she and Emily had a good relationship and denied that she ever rubbed Emily's nose in urine. She related that when Emily wet the bed, she bathed Emily, gave her clean clothes, and cleaned the bed linens. She said that Emily and Preston told her they wanted to come home.

Father testified that he knew Preston and Jeffery's ages but could not recall their actual date of birth. He stated that Jeffery had a brain injury but said that he could not testify as to his prognosis because "they won't give us no information on him." He explained that Jeffery's doctors "said they would not give us information because they'd been told not to give us no information." He could not recall the name of Jeffery's doctor but said that he attended at "least five or six" of Jeffery's doctor's appointments. He asserted that despite the doctor's refusal to give him information, he knew how to care for Jeffery. He stated that he had "seen a lot of special ed kids" and that he "went to school in special ed classes." He insisted that he was willing and able to care for Jeffery.

Father admitted that he participated in the development of the permanency plans for Preston and Jeffery in December 2009. He said that he completed parenting classes and domestic violence classes, had provided proof of legal income, had maintained contact with TDCS, and attended as many of Jeffery's medical appointments as he could attend. He acknowledged that he fulfilled some of the requirements contained in the plans after the petition was filed. He admitted that he withheld information during the mental health

---

[10]The parties entered a stipulation into the record reflecting that TDCS had viewed the residence and deemed it appropriate for the Parents' newborn son.

assessment and that he was told to complete another assessment, which he completed four days before trial. When asked why he had not participated in individual support therapy as recommended by the mental health assessor, he stated that he would participate.

Relative to child support, Father admitted that he signed the criteria for termination of parental rights, advising him that his rights could be terminated if he failed to pay child support. He acknowledged that he did not submit child support until April 2010, almost a year after Preston and Jeffery were removed and placed in TDCS custody. He explained that he could not afford to submit child support. He related that he spent money on gas to attend doctor's appointments, visitations, and classes, that he had to pay his court fees relating to the reckless endangerment conviction, that he had to purchase a larger car to transport the Children, and that he lost his job. He admitted that he received unemployment after he lost his job and that he received a 2009 tax refund check of nearly $6,000. He asserted that he used the tax refund to purchase the car, find a new house, and purchase things for the Children. He also had to pay court costs, fines, and probation fees relating to his guilty plea DUI conviction. He asserted that he had planned to remit his 2010 tax return to TDCS but that TDCS intercepted the check. He insisted that he did his best to support the Children. When asked how much child support he had remitted for Preston when Preston was taken the first and then the second time, he stated, "None, because he was took illegal both times." He acknowledged that he had a duty to support Preston, regardless of where Preston was living but asserted that he was not told to remit child support.

Father admitted that he became angry with a TDCS worker during his supervised visitation and that he raised his voice in front of the Children. He related that it was not a "heated argument" but that he just said what he had to say. He explained that he asked the worker to discuss the issue with him outside but that she refused to leave the room. He insisted that TDCS had not worked to return the Children to him. He stated, "[W]e did not do nothing wrong. I've never done nothing wrong with any child ever." He asserted that TDCS had done "[v]ery little" to help him achieve the goals contained in the permanency plans. He acknowledged that TDCS offered Mother assistance and that they were given a packet of resources, containing a list of providers. He said that TDCS only paid for one evaluation, namely the second mental health assessment. He admitted that all of the other classes and evaluations were free.

When asked whether it was his fault that the Children were in custody, Father stated, "It ain't my fault." When asked whether he would do anything differently if he were granted custody of the Children, he stated, "Well, I'd take care of 'em like I had been taking care of 'em." He asserted that he was a good parent. When asked about Emily's claim that he watched pornography, he insisted that he did not watch pornography. He explained that the

pornographic magazines found in the truck after the accident did not belong to him. He denied ever having exposed the Children to pornography.

Relative to his altercation with Mother, Father explained that Mother scratched and slapped him while he was holding Preston. He admitted that he provoked Mother and made Emily witness the event. He also admitted that he recorded a conversation with Mother in which she stated that she did not love Emily. He related that his current relationship with Mother was really good and that he believed Mother had been doing a lot better and had worked hard to complete the parenting plan requirements. He acknowledged that Mother lied during her testimony when she denied that she hit him while he was holding Preston.

Father testified that his current home was appropriate for the Children, had three bedrooms, and was in "really good shape." He said that he had a good relationship with the landlord and that he also had a good relationship with his current employer. He stated that if he were granted custody of Preston and Jeffery, he would "[t]ake care of [them] and do exactly what needs to be done for them." He alleged that TDCS had not taken adequate care of Jeffery and that Jeffery had lost weight, had long fingernails, and had "dog hair in his ears." He related that Preston told him that he wanted to come home. He asserted that he was willing to follow any recommendations because he would do "whatever it takes" to get Preston and Jeffery back.

Karen Terrazas testified that she worked with the family as a team leader for Omni Visions. She provided support to the foster family, made sure that the needs of the Children were met, and supervised the visitation with the Children. She also notified the Parents regarding medical appointments for the Children. She coordinated with the Parents regarding Jeffery's physical therapy appointments and attempted to schedule those appointments on the days the Parents exercised visitation. She related that Jeffery suffered from a brain trauma, resulting in brain damage, loss of muscle control, and seizures. She said that Jeffery was developmentally delayed because of the trauma. She recalled that Jeffery had approximately 108 medical appointments from June 2009 through December 2010 and that the Parents had attended approximately 20 of those appointments. She said that the Parents asked about Jeffery's condition and that she told them to speak with his doctors and physical therapists. She testified that the Parents never gained an adequate understanding of Jeffery's condition and his medical needs. The Parents also never asked her about Emily's mental health needs.

Ms. Terrazas stated that the Parents had exercised their visitation rights approximately 34 times for 2 hours and 15 minutes each time. She said that visitation with the Parents occurred approximately every other week at the Blount County TDCS office or the Omni Visions office in Knoxville. She related that the Parents brought a snack and a gift for the Children each time. She opined that there had been occasional problems with the visitation.

She testified that Preston would knock Emily's glasses off her face, hit her, bite her, and do other things that were inappropriate but that the Parents failed to follow-through with their discipline of Preston. She recalled that Father had a verbal confrontation with her in September 2010 in front of the Children.

Ms. Terrazas said that Emily loved the Parents and wanted to return home. She stated that Emily never talked about her biological father and only talked about Father. She testified that Father told Emily to say that the foster family was not administering Jeffery's medication correctly. She recalled that at one visitation, Father also told Emily to look for him at his place of employment because it was likely their last visitation. She related that the Children were moved from one foster home to another because of marital issues in the first foster home. She said that the parents in the new foster home had completed the necessary training to provide for Jeffery's unique medical needs.

Rebecca Nichols O'Berry, a licensed clinical social worker, testified that she had been Emily's therapist since March 2009. She stated that she visited with Emily every other week but that recently, she had been visiting with Emily every week. She said that Emily suffered from post-traumatic stress disorder and that Emily had been having "increased symptoms." She reported that Emily disclosed that the Parents said "mean things to her and [made] her feel bad" and that Mother rubbed her nose in urine when she was caught wetting the bed. Emily also told her about the verbal confrontation between Father and Ms. Terrazas and reported that she was worried about visitation with Father because he was angry during the visitation. She related that Emily regressed in September or October 2010 and experienced an increase of symptoms, namely increased nightmares and wetting during the daytime.

Ms. O'Berry testified that she met with Emily after the Children were moved to the new foster home and related that Emily processed the change "very well." She testified that Emily disclosed that in January 2011, Father told her to lie about the new foster parents and that in February 2011, Father told her to visit him at his place of employment if TDCS preventing him from seeing her again. She believed that Emily had not established trust in her experiences with the Parents because of their negative interactions. She admitted that Emily had expressed a desire to return home with the Parents but stated that Emily also expressed "uncertainty about and some worry about [the Parents] staying off of drugs and, you know, staying safe" from "physical abuse and what she would call the whippings." She expounded that Emily expressed "worry that [the Parents] are often angry and upset with her and that she gets in trouble if she says things." When asked whether termination of Mother's parental rights was in Emily's best interest, she stated,

> In my clinical opinion given the continued level of anxiety that [Emily]
> experiences in relationship with [Mother] and [Father] after this period of time

- - in my opinion I do believe that it would be better to terminate that relationship so that she can pursue her other attachments.

Emily Harris, a family service worker for TDCS, was assigned to the case in June 2009. She participated in the development of the permanency plans for Preston and Jeffery. She explained that each plan contained goals and desired outcomes and that each plan also contained action steps to achieve those goals and outcomes. She stated that they discussed the goals, desired outcomes, and action steps at each meeting and that the Parents were present for those meetings in which they orally discussed each page of the plan. The July 2009 plans had an achievement date of January 24, 2010, but the Parents never achieved any of the outcomes contained in the July 2009 permanency plans.

Ms. Harris testified that she participated in the development of new permanency plans for Preston and Jeffery in December 2009 and that she instructed the Parents to submit documentation if they had already completed any of the action steps contained in any of the prior 2009 plans. She gave the Parents a list of providers and offered to help them fulfill the action steps. She became concerned when the Parents did not submit any documentation because the Parents "had ample time to at least get started on something." She admitted that the Parents visited the Children regularly but contended that complying with visitation "was the only thing they were doing in an effort to regain custody." She testified that she never received any documentation prior to the filing of the termination petition. She recalled that she spoke with Mother three days before the termination petition was filed and that Mother related that they had found a home and had moved. She stated that TDCS received the first child support payment the day she spoke with Mother and that her attempts to visit the new residence after the termination petition was filed were unsuccessful. She eventually received documentation that Father had undergone a mental health assessment, had obtained a legal source of income, and had completed domestic violence classes.

Ms. Harris testified that even though the Parents completed some of the steps following the filing of the termination petition, she did not believe that the Parents had fulfilled the outcome of the permanency plans. She stated,

> Well, part of those action steps is that they attend those medical appointments with the doctors and that they educate themselves about the [C]hildren's needs. And the only way you can truly educate yourself is to go and to ask questions and to be involved in that child's care. And it's very obvious that they have not involved themselves in the child's care.

When asked which conditions in the home persisted that led her to believe that the Children would be subject to further abuse or neglect, she stated,

The [P]arents' behaviors at the visits for one thing. Their denial of any history of domestic violence is a concern. The [P]arents' characterization of the physical abuse as simply discipline is a huge concern. Their lack of knowledge about the [C]hildren and how to care for them.

The lack of knowledge of their dates of birth is a huge concern. If you were to call one of their doctors and try to set up an appointment or something, you're going to have to give the child's date of birth.

Lack of knowledge about [Jeffery's] doctors is a very big concern. His doctors have been consistent from the beginning. And they're saying that they went to some of those appointments, yet they still can't tell you who those doctors are.

Their denial of any kind of pornographic material, even though it's well-documented that there has been pornographic material around the [C]hildren.

* * *

And I also have concerns about their willingness to be truthful on several occasions, including the Mental Health Assessment. You know, if they had just been truthful, then they wouldn't have had to go back and do the assessment.

[Father's] criminal history is a concern, and his unwillingness to take responsibility or acknowledge that criminal history is a concern.

Ms. Harris admitted that the Children had been moved to a new foster home and that repeated moves have a "detrimental effect" on children in general. She also admitted that Mother had completed several of the action steps but asserted that Mother's behavior showed "that the outcomes [had] not been reached."

Following Ms. Harris' testimony, the parties agreed that Father had submitted to a mental health assessment in February 2011 and a drug and alcohol screen. Father tested negative for all substances but failed to comply with the recommendations of the assessment. The parties also agreed that Father's friend, Mike Woods, would testify that the pornography and beer can in the vehicle did not belong to Father but belonged to someone else.

Following the trial, the court found that the Parents were not credible but were "evasive, verbally combative and inconsistent in their testimony." The court held that there

was clear and convincing evidence to establish that Father abandoned Preston and Jeffery by failing to remit child support, that the Parents abandoned the Children by failing to provide a suitable home, that the Parents failed to substantially comply with the requirements of the permanency plans, and that the conditions which led to removal persisted. The court found that despite TDCS's reasonable efforts to assist the Parents, termination of Mother's parental rights was in the best interest of the Children and that termination of Father's parental rights was in the best interest of Preston and Jeffery. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised by the Parents on appeal as follows:

A. Whether grounds existed to support the termination of Mother's parental rights to the Children and Father's parental rights to Preston and Jeffery.

B. Whether TDCS used reasonable efforts to assist the Parents in reuniting with the Children.

C. Whether termination of the Parents' parental rights was in the best interest of their respective children.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004).

-15-

Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

### A.

#### 1. Abandonment

#### i. Child support

Father asserts that the court erred in terminating his parental rights based upon the ground of abandonment for willful failure to support. TDCS responds that Father was aware of his obligation to support Preston and Jeffery and that he simply refused to remit support during the relevant time period, the four months preceding the filing of the petition.

The Tennessee Code provides, in pertinent part,

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have *willfully failed to support or have willfully failed to make reasonable payments toward the support of the child*[.]

* * *

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means[.]

Tenn. Code Ann. § 36-1-102(1)(A), (B) (emphasis added). A parent's willful failure to support the child or make reasonable payments toward support of the child "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D).

This court has consistently held that the term willfulness as it applies to a party's failure to support a child must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). Indeed, "defining abandonment as the mere non-payment of support [is] unconstitutional because this language creates an irrebuttable presumption of abandonment, irrespective of intent." *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003) (citing *In re Swanson*, 2 S.W.3d at 188). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64. Additionally, "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

Father was aware of his support obligation because it was a requirement contained in the permanency plans. Testimony was presented that the permanency plan requirements were read to Father and that the court advised the Parents that failure to fulfill the requirements could result in the termination of parental rights. Father erroneously places importance on the fact that he was not specifically ordered by the court to remit child support until March 2010. "[T]he obligation to pay support exists even in the absence of a court order to do so." *Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004). Indeed, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Tenn. Code Ann. § 36-1-102(1)(H). Father was born on January 6, 1979; therefore, he was 18 years of age or older during the relevant four-month period, December 30, 2009 through April 30, 2010, in which he was alleged to have failed to remit child support. Tenn. Code Ann. § 36-1-102(1)(A)(i). Father submitted one payment of $200 during that time period even though he had income from different sources, namely unemployment and a tax refund. Father chose to use the money available to him to pay court fees and purchase other items. Father confirmed that he did not remit support because his children were taken "illegally" and because he had other monetary obligations.

We reject Father's assertion that termination of his parental rights was inappropriate because he was current with his child support obligation at the time of trial. The relevant period for our consideration is the four months immediately preceding the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i). During that time period, Father submitted one payment of $200 and brought clothes and snacks to Preston and Jeffery. We believe that his one payment and gifts to Preston and Jeffery were merely token support. We acknowledge that Father submitted additional payments, that his 2010 tax refund was intercepted to fulfill his support obligation, and that a portion of his paycheck was assigned to child support. These payments were received after the termination petition was filed. "Abandonment may not be repented of by resuming . . . support subsequent to the filing of any petition seeking to terminate parental" rights. Tenn. Code Ann. § 36-1-102(1)(F). Accordingly, we conclude that there was clear and convincing evidence to support termination of Father's parental rights based upon his abandonment of Preston and Jeffery for his willful failure to remit child support.

### ii. Failure to provide a suitable home

Father asserts that Preston and Jeffery were never without a physical home, that TDCS failed to prove that his home was unsuitable, and that he never demonstrated a lack of concern for Preston and Jeffery. Likewise, Mother asserts that she always had a physical home for the Children, that she never demonstrated a lack of concern for them, that she was familiar with Jeffery's medical condition, and that TDCS did not exert reasonable efforts to assist them in providing a suitable home. TDCS responds that the Parents' lack of concern for the Children and disregard for the Children's medical needs evidenced their inability to provide a suitable home at an early date.

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> * * *
>
> (ii) . . . for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be

-18-

reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

A suitable home is more than just a "physical space." *In re A.D.A.*, 84 S.W.3d 592, 599 (Jan. 24, 2002) (accepting the State's assertion that a "suitable home requires more than physical space"). Here, each child required assistance with a unique medical or mental health condition. Jeffery would likely remain dependent for the remainder of his life, while Emily was battling post-traumatic stress disorder and Preston had behavioral issues. The Parents did not attend the majority of the Children's medical appointments, did not apprise themselves of the Children's varying medical conditions or attempt to speak with their respective physicians about their continued care, and were unconcerned when Preston exhibited his behavioral issues during visitation. Shortly before trial, Father encouraged Emily to lie about the foster parents and attempted to negatively influence her by stating that it would likely be their last visit.

The Parents contend that this court should disregard the emphasis on the four months following removal. Tenn. Code Ann. § 36-1-102(1)(A)(ii). We agree that the four-month period is irrelevant to this case because the home remained unsuitable at the time of trial. At trial, the Parents continued to deny responsibility for the Children's removal and attempted to blame TDCS and the doctors for their unfamiliarity with the Children's medical conditions. The Parents contended that TDCS failed to provide notice of Jeffery's medical appointments and that they were denied access to medical records. However, the court found that the Parents were not credible witnesses. Following our review, we conclude that TDCS's efforts in assisting the Parents in establishing a suitable home were reasonable.[11] TDCS provided the Parents with a list of providers and continually revised the permanency plans while attempting to maintain contact with the Parents. TDCS continually offered their assistance in hope of reuniting the Parents with the Children. TDCS also instructed them to speak with Jeffery's doctors. With these considerations in mind, we conclude that there was clear and convincing evidence to establish that the Parents abandoned the Children by failing to provide a suitable home and that their testimony at trial evidenced such a continued lack of concern for the Children that it is unlikely that they would be able to provide a suitable home at an early date. Accordingly, we also conclude that a statutory ground exists for the termination of Mother's parental rights to the Children and that a second statutory ground exists for the termination of Father's parental rights to Preston and Jeffery.

---

[11] TDCS's efforts will be discussed in greater detail later in this opinion.

## 2. Substantial noncompliance

Father acknowledges that he completed the requirements contained in the plans "slower than [TDCS] would have liked" but contends that the record did not support a finding that his noncompliance was substantial. Mother contends that she was making "steady progress" on the requirements before the petition was filed and that she eventually fulfilled the requirements. TDCS responds that the Parents failed to substantially comply with the requirements contained in the plans.

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2).

To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *In re Z.J.S.*, 2003 WL 21266854, at *12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

In finding that the Parents had failed to substantially comply with the permanency plans, the court stated that the requirements were reasonable and "related to the reasons the [C]hildren each came into foster care." The court further stated,

> Parenting classes were appropriate due to the choices of behavior the [P]arents had demonstrated prior to the [C]hildren coming into custody. It took over a year for [the Parents] to attend and complete parenting classes; and they were only completed after the petition to terminate had been filed.

Anger management classes were appropriate, as [M]other had abused [Emily] as a form of "discipline" and there was a documented history of inappropriate and harmful behavior between the [P]arents, sometimes in the [C]hildren's presence. It took over a year for [Father] to complete the anger management class. Domestic violence education was appropriate due to the allegations by both parties and the prosecution for domestic violence (which was handled as a form of diversion); again, it took a year for the [P]arents to get the domestic violence class completed.

Mental health assessments were appropriate because [the Parents] have some difficulty understanding what is being said to them and making themselves understood; testimony at trial showed that [the Parents], when finally having the assessments done, were not honest with the evaluators and did not follow through with recommendations.

Of special concern is the [P]arents' choice not to comply with the requirement that they attend Jeffery's medical appointments and educate themselves on the special needs of a child with severe brain trauma. Neither of the [P]arents attended many of Jeffery's appointments or could tell the [c]ourt [the] name of Jeffery's doctor or what his diagnosis and prognosis are.

We acknowledge that, as raised by Mother, Tennessee Code Annotated section 36-1-113(g)(2) mandates "compliance with the actions required to be taken by the parent or parents," not the desired outcomes contained within the plans. *Dep't of Children's Servs. v. P.M.T.*, E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App. Sep. 15, 2006). Thus, parents need only substantially complete the action steps and requirements contained in the permanency plan in order for the court to find the compliance substantial.

Here, the Parents failed to fulfill a number of the requirements contained in the permanency plans and only completed the other requirements after the termination petition had been filed. We acknowledge that Mother had completed several requirements in Emily's earlier plans prior to Preston and Jeffery's removal. However, the Parents were tasked with completing these requirements anew with different providers. The Parents completed the mental health assessment, but this assessment was rejected because of their untruthfulness. Father completed a second mental health assessment days before trial, while Mother failed to complete a second assessment. The Parents only attended 20 of Jeffery's 108 medical appointments and were not educated on his condition and needs. The Parents failed to appropriately discipline Preston when he experienced behavioral issues during visitation. Father only remitted minimal child support prior to the filing of the termination petition. Mother completed the bonding assessment one day prior to the filing of the termination

-21-

petition. The Parents completed parenting classes and presented proof of legal income after the termination petition had been filed.

We believe that the Parents' refusal to complete a number of the requirements until after the termination petition was filed in April 2010 was simply "[t]oo little, too late" when Emily had been in foster care since October 2008 and Preston and Jeffery had been in foster care since May and June 2009, respectively. *In re A.W.*, 114 S.W.3d 541, 546-47 (Tenn. Ct. App. 2003). Additionally, questions remain as to whether they learned anything from their untimely attendance of the required courses when they continued to deny responsibility for their actions. The Parents were given an adequate time in which to complete the requirements. The majority of the required classes were free. TDCS paid for at least one assessment, provided the Parents with relevant information, and continually advised them regarding the requirements they needed to fulfill. The Parents simply ignored their responsibilities and potential consequences of their actions. Accordingly, we conclude that the court's finding that the Parents were in substantial noncompliance with the permanency plans is supported by clear and convincing evidence, that a second statutory ground existed for termination of Mother's parental rights to the Children, and that a third statutory ground existed for termination of Father's parental rights to Preston and Jeffery.

### 3. Persistence of conditions

Father asserts that the only condition which led to removal was the car accident and that there was "no evidence in the record that [he] continued to have [car] accidents." He contends that he completed parenting classes that included instruction on the proper use of a child safety seat. Mother argues that TDCS failed to submit clear and convincing evidence that the conditions which led to removal persisted. She contends that she completed domestic violence and parenting classes and that while she failed to discipline Preston during visitation, his misbehavior occurred in less than a third of the visits. She notes that it was difficult to discipline Preston when her visitations with him were limited in number and duration. TDCS responds that the conditions which led to removal persisted as evidenced by the Parent's refusal to accept responsibility for the Children's removal and continued denial of the problems in the home. TDCS also asserts that continuation of the Parents' relationship with the Children "would greatly diminish the [C]hildren's chances of early integration into a safe, stable, and permanent home."

Under Tennessee law, a court may terminate parental rights when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

-22-

(A) The conditions that led to the child's removal *or* other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

The court held that the conditions that led to the removal of the Children persisted by stating,

In addition to continuing to maintain that neither of them have done anything wrong with regard to their children or their behavior to each other, [the Parents] show absolutely no insight into the problems of domestic violence in the home, the problem of having pornography available to children, or of appropriate parenting (as evidenced during some of the supervised visits).

[The Parents'] testimony at trial makes it clear that there is little chance that these conditions will be remedied soon so that the [C]hildren can be safely returned home. Continuation of the parent/child relationship greatly diminishes the [C]hildren's chances of being placed into a safe, stable and permanent home.

Here, it is undisputed that the Children had been in TDCS custody for more than six months at the time TDCS filed the termination petition. Relative to Emily, the specific event which led to removal the most recent time involved the incident in which she was found naked with another child. The other conditions contributing to removal related to Mother's past mistreatment of Emily, Mother's failure to properly supervise Emily, and the Parents' failure to properly restrain Preston and Jeffery prior to the car accident. Relative to Preston and Jeffery, the specific event which led to removal involved the Parents' failure to properly restrain Preston and Jeffery in the car seats prior to a devastating accident that permanently

-23-

injured Jeffery and his development. The other conditions contributing to removal related to Mother's treatment of Emily, Preston's weight loss since his first involvement with TDCS, and the discovery of a substantial amount of pornography in Father's truck.

The Parents' testimony at trial reflected that the conditions which led to removal persisted and that "conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect" persisted. Mother denied that there were ever domestic violence issues in the household and that she mistreated Emily. She nominalized the physical abuse and denied her inappropriate punishment of Emily for wetting the bed. Neither parent accepted full responsibility for their actions, and the Parents expressed doubt regarding the reasons for the removal of the Children. Thus, there was little likelihood that the conditions prohibiting the return of the Children would be remedied.

Additionally, the Parents allowed the Children to languish in TDCS custody while they lingered in their efforts to complete the requirements. Indeed, most of the classroom requirements were fulfilled after the petition had been filed. The Parents also failed to educate themselves on Jeffery's medical condition and only attended a small portion of his medical appointments. Accordingly, the evidence does not preponderate against the trial court's finding that persistent conditions were established by clear and convincing evidence, that continuation of the parent-child relationship would greatly diminish the Children's integration into a safe, stable, permanent home, that a third statutory ground existed for termination of Mother's parental rights to the Children, and that a fourth statutory ground existed for termination of Father's parental rights to Preston and Jeffery.

B.

Although not raised as a separate issue, the Parents make varied complaints regarding the efforts expended by TDCS in reuniting them with the Children.

Once a child has been removed from a parent's home, TDCS is tasked with making it possible for the child to return home before instituting termination proceedings. Tenn. Code Ann. § 37-1-166(a)(2). At the termination proceeding, TDCS must prove by clear and convincing evidence that reasonable efforts were made to reunite the child with the parent. Tenn. Code Ann. § 37-1-166(b). For purposes of TDCS's involvement, the term reasonable efforts refers to "the exercise of reasonable care and diligence by the [TDCS] to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). "The reasonableness of [TDCS's] efforts depends upon the circumstances of the particular case." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

-24-

"While [TDCS's] reunification efforts need not be "herculean," TDCS must do more than simply provide the parents with a list of services and send them on their way." *Id.* "[TDCS] employees must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *Id.* These "employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan." *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008). In keeping with this ideal, TDCS must provide an affidavit, identifying its reasonable efforts, for the court's consideration. Tenn. Code Ann. § 37-1-166(c); *see In re R.L.F.*, 278 S.W.3d at 317. In determining whether the efforts used by TDCS were reasonable, the court should consider the Department's affidavit and the following factors:

(1) the reasons for separating the parent from his or her children,

(2) the parent's physical and mental abilities,

(3) the resources available to the parent,

(4) the parent's efforts to remedy the conditions that required the removal of the children,

(5) the resources available to [TDCS],

(6) the duration and extent of the parent's remedial efforts,

(7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and [TDCS's] efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519. However, "'[r]eunification of a family is a two-way street, and the law does not require [TDCS] to carry the entire burden of this goal." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006) (quoting *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002)). "Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [TDCS] to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519.

In the certified petition, TDCS listed several of its attempts to assist the Parents. TDCS also submitted a timeline, listing each action taken in their attempts to reunite the

Parents with the Children and in their attempts to maintain contact. Having reviewed their lists, we believe that TDCS took great measures to work with the Parents but that the Parents simply failed to take advantage of all of the resources that were offered to them. Accordingly, we conclude that the record contains clear and convincing evidence that TDCS made reasonable efforts to assist the Parents in their attempts to reunite with the Children.

C.

Having concluded that there was clear and convincing evidence supporting each of the statutory grounds for termination and that TDCS made reasonable efforts to assist the Parents, we must consider whether termination of their parental rights was in the best interest of the Children. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In this case, a number of the best interest factors weigh against the Parents. Despite their participation in the creation of several permanency plans, the Parents refused to acknowledge their responsibility for the removal of the Children at trial. We believe that the refusal to acknowledge responsibility is evidence of their failure to adjust their conduct or make a lasting adjustment in order to make it safe and in the best interest of the Children to return home. Mother also refused to acknowledge that there was ever an issue of domestic violence in the home and insisted that her participation in domestic violence classes was unnecessary. Tenn. Code Ann. § 36-1-113(i)(1),(2). Other than the fact that Emily and Preston expressed some desire to return home, testimony was not presented to establish that the Parents had maintained a *meaningful* relationship with the Children. Indeed, Emily expressed reservations about the idea of returning home. Tenn. Code Ann. § 36-1-113(i)(4). The testimony at trial reflected that Mother physically abused Emily and pushed Emily's nose into urine on repeated occasions prior to Emily's removal. Tenn. Code Ann. § 36-1-113(i)(6). Questions remain as to whether the Parents' home is healthy and safe. Mother refuses to acknowledge that she abused Emily and insists that she merely disciplined Emily too hard. Mother also adamantly denied that she mistreated Emily when she found that Emily had wet the bed. When Emily was found naked with another child, Mother told Emily

to lie about the incident. Additionally, there were allegations of domestic violence between the Parents, namely that Mother scratched and slapped Father and that Father had physically abused Mother. Tenn. Code Ann. § 36-1-113(i)(7). While Mother was not tasked with remitting child support, Father failed to pay child support consistent with the child support guidelines. Tenn. Code Ann. § 36-1-113(i)(9).

We acknowledge that the Parents generally took advantage of the opportunities for supervised visitation with the Children and that their mental and emotional status did not appear to be detrimental to the children. Tenn. Code Ann. § 36-1-113(i)(3), (8). We also acknowledge that shortly before trial, the Children had been moved to a new foster home. Thus, it was too early to discern whether and to what extent removal from the foster home would affect the Children. Tenn. Code Ann. § 36-1-113(i)(5). However, Jeffery's removal from the new foster home could potentially impact his medical condition. The new foster home was equipped to care for Jeffery's unique medical needs, while testimony at trial reflected that the Parents failed to attend the majority of Jeffery's medical appointments and were incapable of understanding his medical condition and future prognosis. As previously mentioned, Emily expressed reservations about returning home. Mother also failed to express any interest in Emily's emotional and psychological condition, and Emily showed signs of regression the last time she was returned to Mother's care.

With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Children and that termination of Father's parents rights was in the best interest of Preston and Jeffery. Accordingly, we affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed one-half to Mother, Teresa O., and one-half to Father, Harrison O.

_____
JOHN W. McCLARTY, JUDGE

-28-